**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | * | Case No. 20-34805 (DRJ) |
| | * | |
| LONESTAR RESOURCES US INC., et al., | * | Chapter 11 |
| | * | |
| Debtors. | * | (Jointly Administered) |

**A2D TECHNOLOGIES, INC.'S OBJECTION TO CONFIRMATION OF THE
JOINT PREPACKAGED PLAN OF REORGANIZATION FOR LONESTAR
RESOURCES US INC. AND ITS AFFILATE DEBTORS UNDER CHAPTER 11 OF THE
BANKRUPTCY CODE, AND TO ASSUMPTION OR ASSUMPTION AND
ASSIGNMENT OF ITS LICENSE AGREEMENTS BY THE DEBTORS**
[Related to ECF Nos. 29 & 143]

TO THE HONORABLE DAVID R. JONES, UNITED STATES BANKRUPTCY JUDGE:

A2D Technologies, Inc., d/b/a TGS Geological Products and Services ("TGS") submits

this objection to confirmation of the Joint Prepackaged Plan of Reorganization for Lonestar

Resources US Inc. and its Affiliate Debtors under Chapter 11 of the Bankruptcy Code [ECF No.

29] (the "Plan"), filed herein by Lonestar Resources US Inc., Lonestar Resources Intermediate

Inc., LNR America Inc., Lonestar Resources America Inc., Amadeus Petroleum Inc., Albany

Services, L.L.C., T-N-T Engineering, Inc., Lonestar Resources, Inc., Lonestar Operating, LLC,

Poplar Energy, LLC, Eagleford Gas, LLC, Eagleford Gas 2, LLC, Eagleford Gas 3, LLC,

Eagleford Gas 4, LLC, Eagleford Gas 5, LLC, Eagleford Gas 6, LLC, Eagleford Gas 7, LLC,

Eagleford Gas 8, LLC, Eagleford Gas 10, LLC, Eagleford Gas 11, LLC, Lonestar BR Disposal

LLC, and La Salle Eagle Ford Gathering Line LLC (each, a "Debtor" and collectively, the

"Debtors"), and the assumption or assumption and assignment of the License Agreements between

TGS and one or more of the Debtors, and in support thereof, respectfully submit as follows:

**I.      INTRODUCTION**

1.     The Court should deny confirmation of the Debtors' Plan because it contains material provisions that are contrary to the United States Bankruptcy Code (the "Bankruptcy Code") and applicable bankruptcy law, thus rendering the Plan non-confirmable under Bankruptcy Code § 1129(a)(1).

2.     Specifically, the provisions of the Plan that purport to nullify (or modify so that they are ineffective) change of ownership or control provisions such as are contained in some of TGS' License Agreements with one or more of the Debtors are contrary to law.

3.     The Plan further violates settled bankruptcy law to the extent it provides for a change of ownership and control of the Debtors in violation of the change of ownership or control provisions in some of TGS' License Agreements, but purports to enable the Debtors to assume or assume and assign the License Agreements without requiring that the Debtors cure all defaults thereunder, including those under the change of ownership or control provisions, and without providing adequate assurance of future performance thereof.

4.     In addition, the Plan, in violation of bankruptcy law, purports to authorize the Debtors to assume or assume and assign TGS' License Agreements without TGS' consent, notwithstanding that the License Agreements are non-assumable and non-assignable under Bankruptcy Code § 365 (c)(1)(A).

5.     Moreover, the release provisions of the Debtors' Plan are overbroad, non-specific, and would impair TGS' rights and remedies under its License Agreements with the Debtors. Thus, they fail to meet the standards and requirements for such clauses that have been adopted by the United States Fifth Circuit Court of Appeals.

6.     In addition to TGS' objections to confirmation of the Debtors' Plan, TGS also objects to assumption or assumption and assignment of its License Agreements with the Debtors.

7.     As stated above, some of TGS' License Agreements contain valid change of ownership and control provisions which will be breached by the Debtors upon confirmation of the Debtors' Plan, and the Debtors cannot assume or assume and assign those License Agreements without curing all defaults thereunder, including any defaults under the change of ownership or control provisions, and without providing TGS with adequate assurance of future performance thereof, as required by law.

8.     In addition, the Debtors have not proposed to cure all of the monetary defaults existing under TGS' License Agreements.

9.     Finally, TGS' License Agreements are non-assumable and non-assignable under Bankruptcy Code § 365 (c)(1)(A) without the consent of TGS, and TGS does not consent, absent payment of a mutually agreed upon "cure" amount.

## II.     BACKGROUND

10.     The TGS is a geophysical services company that is in the business, *inter alia*, of providing worldwide geoscientific data products and services to the oil and gas industry for the purpose of providing descriptions of subsurface geology for potential oil and gas exploration and/or production and other uses. These products include, but are not limited to well and petroleum data, which are generally offered to licensees on a multi-client basis for a limited term.

3

11.     The Debtors are affiliated entities involved in the acquisition, exploration, development, production and operation of crude oil and natural gas properties, primarily in the Eagle Ford Shale region of southern Texas.[1]

12.     Lonestar Resources US Inc. ("Lonestar US") is the direct or indirect parent company of the twenty-one (21) Debtor-subsidiaries.[2] It is a publicly traded entity that is listed and traded on NASDAQ.[3]

13.     As of September 30, 2020, Lonestar US had 25,375,314 shares of Class A Common Stock (the "Common Stock") issued and outstanding as well as 104,893 shares of Series A-1 Convertible Participating Preferred Stock (the "Preferred Stock") issued and outstanding. The Preferred Stock is convertible into Common Stock and has voting rights equal to that of the holders of the Common Stock.[4] All of the Preferred Stock is owned by Chambers Energy Capital III, LP ("Chambers"), which, on an "as-converted basis" would entitle Chambers to approximately forty (40%) percent of Lonestar US' Common Stock.[5] The largest holder of Lonestar US' Common Stock is Jefferies Financial Group, Inc. ("Jefferies"), which as of March 31, 2020 held approximately eighteen (18%) percent thereof.[6] Other large owners of the Common Stock of Lonestar US include Wastach Advisors (8%), Sanchez Energy Corporation (6%), and the Executive Officers and Directors of Lonestar US (4%).[7]

---

[1] Disclosure Statement for Joint Prepackaged Plan of Reorganization for Lonestar Resources US Inc. and its Affiliate Debtors under Chapter 11 of the Bankruptcy Code [ECF No. 28] (the "Disclosure Statement"), at p. 19 of 338.
[2] *Id.* at p. 20 of 338.
[3] *Id.* at p. 22 of 338.
[4] *Id.* at pp. 20, 22 of 338. *See also* Proxy Statement (Schedule 14A) of Lonestar US dated 5/26/20, at p. 11.
[5] *Id.* at p. 21 of 338.
[6] *Id.* at p. 22 of 338.
[7] Proxy Statement (Schedule 14A) of Lonestar US dated 5/26/20, at p. 29.

14.     Lonestar US and its subsidiaries are managed and controlled by Lonestar US'
Board of Directors, which is currently comprised of eight (8) members.[8]   Pursuant to the terms of
a Purchase Agreement between Lonestar US and Chambers, Chambers has the right to appoint,
and has appointed, two (2) directors to Lonestar US' board.[9] The other directors are comprised of
the CEO of Lonestar US, the Chairman of the Board of Lonestar US, and four (4) independent
directors.[10]   Directors are elected if the votes of the holders of Lonestar US' Common Stock and
Preferred Stock, voting together as a single class and with the Preferred Stock voting on an as-
converted basis, for a nominee exceed the votes cast against the nominee.[11]

### III.   THE BANKRUPTCY CASE AND PLAN

15.     On September 30, 2020 (the "Petition Date"), each of the Debtors filed voluntary
petitions for relief pursuant to Chapter 11 of Title 11 of the Bankruptcy Code. Since the Petition
Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession
pursuant to Bankruptcy Code §§1107 and 1108(a).

16.     On the Petition Date, the Debtors also filed their Plan [ECF No. 29] and Disclosure
Statement [ECF No. 28]. By Order (I) Scheduling Combined Hearing on (A) Adequacy of
Disclosure Statement and (B) Confirmation Of Plan; (II) Fixing Deadline to Object to Disclosure
Statement and Plan; (III) Approving (A) Solicitation Procedures, (B) Form and Manner of Notice
of Commencement, Combined Hearing, and Objection Deadline, and (C) Notice of Non-Voting
Status and Opt Out Opportunity; (IV) Approving Procedures for Assumption of Contracts and

---

[8] Disclosure Statement [ECF No. 28], at p. 23 of 338.
[9] *Id.* at p. 21, n. 5.
[10] *Id.* at p. 23 of 338.
[11] Proxy Statement (Schedule 14A) of Lonestar US dated 5/26/20, at p. 11. *See also* Amended and Restated Bylaws
of Lonestar US, Article 1, Section 7(c), at p. 5.

Leases and Form and Manner of Cure Notice; (V) Conditionally Approving Disclosure Statement; (VI) Conditionally (A) Directing the United States Trustee not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities; and (VII) Granting Related Relief [ECF No. 83] (the "Scheduling Order"), the Court, among other things, conditionally approved the Disclosure Statement, approved the Debtors' proposed solicitation materials, scheduled a combined hearing on final approval of the Disclosure Statement and on confirmation of the Debtors' Plan, and established various deadlines relating to same.

17.     The Debtors' Plan is governed by the provisions of a Restructuring Support Agreement dated 9/14/20 (the "RSA") between the Debtors and the Debtors' "Consenting Creditors", which is premised upon a de-leveraging of the Debtors' balance sheet and conversion of a portion of their debt into equity.[12]

18.     Under the Plan, holders of "Other Priority Claims", "Secured Tax Claims", and "General Unsecured Claims" are essentially to be paid in full and holders of "Other Secured Claims" are to either be paid in full, receive such other treatment as renders their claims unimpaired, receive back their collateral, or be given such other treatment as may be agreed to by the holder of such a claim.[13]   "Prepetition RBL Claim" holders are, if they vote to accept the Plan, to receive a pro rata portion of the "Prepetition RBL Cash Distribution", "Exit Revolving Loan", "New Warrants" and "Exit Second Out Term Loans" and if they reject the Plan, a pro rata portion of the Prepetition RBL Cash Distribution and "Exit Last Out Term Loans".[14]

---

[12] Plan [ECF No. 29] at pp. 23, 27 of 165. *See also* the RSA attached as Exhibit A to the Plan.
[13] Plan, at pp. 25-6, 29 of 165.
[14] *Id.* at pp. 27-8 of 165.

19.     Perhaps most significantly, holders of "Prepetition Notes Claims" are, under the Plan, to each receive a pro rata share of approximately ninety-six (96%) percent of the "New Equity Interests" of Reorganized Lonestar US and holders of "Old Parent Preferred Interests" are to receive a pro rata share of three (3%) percent of Lonestar US' New Equity Interests.[15]   While the existing equity interests in Lonestar US are to be cancelled, the Plan provides that holders of Lonestar US' "Old Parent Common Interests" are to receive a pro rata share of one (1%) of the New Equity Interests of Lonestar US.[16]

20.     According to the Plan, each of the Debtors are, subject to the terms of the RSA and the "Restructuring Transactions", to continue to exist after the Effective Date.[17]  Nevertheless, the Plan provides that the Restructuring Transactions may include one or more mergers, amalgamations, consolidations, restructures, dispositions, liquidations, dissolutions, or creations of one or more new Entities.[18]

21.     Further, the Plan provides that on the Effective Date, the "New Board" of Lonestar US shall be appointed, which shall be selected by the "Ad Hoc Noteholders Group" and shall include the CEO of Reorganized Lonestar US and such other members as are identified in the Plan Supplement.[19]  The term "Ad Hoc Noteholders" is vaguely defined as meaning "that certain ad hoc group of Prepetition Noteholders".[20]  The initial new boards of directors or other governing bodies of each Debtor-subsidiary of Lonestar US are to consist of one or more of the directors or officers

---

[15] *Id.* at pp. 27-8 of 165.
[16] *Id.* at p. 30 of 165. In addition, the Plan provides that all "Old Lonestar Subsidiary Interests" are to remain in effect and outstanding on the Effective Date. *Id.*
[17] *Id.* at p. 33 of 165.
[18] *Id.* at p. 32 of 165.
[19] *Id.* at p. 37 of 165.
[20] *Id.* at p. 9 of 165.

of Reorganized Lonestar US.[21]

22.     As to executory contracts, the Plan generally provides that all executory contracts are to be deemed assumed unless it: (1) is assumed or rejected by prior Order; (2) is subject to a motion to reject filed by the Debtors pending on the Effective Date; (3) is identified as rejected on the Plan Schedule 7 to be filed in the Plan Supplement, or (4) is rejected or terminated pursuant to the terms of the Plan.[22]   The Debtors specifically reserved the right to amend their list of rejected executory contracts prior to the Effective Date of the Plan.[23]   Counterparties to executory contracts that are to be assumed or assumed and assigned are supposed to receive a Cure Notice from the Debtors at least twenty-one (21) days prior to the "Plan Objection Deadline", and if the counterparty objects to the Cure Notice or assumption or assumption and assignment generally, it is required to file an objection prior to the Plan Objection Deadline.[24]

23.     Significantly, the Plan provides that assumption or assumption and assignment of an executory contract "shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, **including defaults of provisions restricting the change in control or ownership interest composition** or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, . . ." (emphasis added).[25]

24.     Similarly, another provision of the Plan provides that "to the extent any provision in any executory contract assumed or assumed and assigned pursuant to the Plan or any prior order

---

[21] *Id.* at p. 37 of 165.
[22] *Id.* at pp. 41-2 of 165.
[23] *Id.* at pp. 42, 43 of 165.
[24] *Id.* at pp. 42-3 of 165.
[25] *Id.* at p. 43 of 165.

of the Bankruptcy Court (**including, without limitation, any "change of control" provision**) prohibits, restricts or conditions, . . . or is modified, breached or terminated, . . . by, (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or Consummation of this Plan, **then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease** or to exercise any other default related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of this Plan" (emphasis added).[26]

25.     On October 13, 2020, the Debtors filed a Notice of Cure Amounts in Connection With Executory Contracts and Unexpired Leases [ECF No. 143] (the "Cure Notice"). The Cure Notice lists a Master License Agreement for Geological Data dated 4/5/18 between Lonestar Resources Inc. and TGS as being proposed to be assumed or assumed and assigned by the Debtors, with a cure amount of $120.00.[27]

## IV.   THE LICENSE AGREEMENTS BETWEEN TGS AND THE DEBTORS

26.     Prior to the Petition Date, TGS licensed geological, well, petroleum and other data and information, as well as derivatives thereof (the "Licensed Materials"), to one or more of the Debtors herein pursuant to written license agreements as well as various supplements and/or

---

[26] *Id.* at p. 42 of 165.
[27] Cure Notice [ECF No. 143], at p. 8 of 9.

related agreements (collectively, the "License Agreements").

27.     Specifically, by LOG-LINE Plus!® Operating Agreement effective October 23, 2014 (the "LOG-LINE Plus!® Agreement") between TGS and LRI, TGS licensed certain proprietary petroleum data and derivatives thereof owned by it to LRI on a non-exclusive basis, for a designated period of time, subject to certain fee arrangements, confidentiality provisions, transfer restrictions, and other terms set forth therein.

28.     By Addendum I to the LOG-LINE Plus!® Agreement dated January 26, 2016 (the "LOG-LINE Plus!® Addendum I"), TGS granted LRI a non-exclusive perpetual license to certain LASSO+ well data packages collected from the United States owned by TGS, at the prices and pursuant to the terms set forth therein.

29.     By Well Performance Data Subscription and Oyster Plan Addendum dated November 7, 2014 (the "Oyster Plan Addendum"), TGS granted LRI a non-exclusive license, for a designated period of time, to access and use certain TGS raster and smartRASTER® Images and TGS Well Performance Data from the TGS LOG-LINE Plus!® database and TGS Nationwide Well Performance database in the United States, subject to certain fee arrangements, confidentiality provisions, transfer restrictions, and other terms contained therein.

30.     Thereafter, by Master License Agreement For Geological Data No. 3927 effective April 5, 2018, as supplemented by Supplement Nos. 1, 2, 3 and 4 thereto (collectively, the "New Geological Licenses"), the TGS Entities granted Lonestar Resources, Inc. ("LRI") a non-exclusive license, for a designated period of time and subject to certain fee arrangements, confidentiality provisions, transfer restrictions, and other terms contained therein, to access through the TGS R360® and/or LOG-LINE Plus!® e-commerce portals and use certain proprietary geological,

well, petroleum and other data and derivatives owned by TGS, as well as presentation software owned or licensed by TGS.

31.    In the New Geological Licenses, LRI agreed, among other things, that:

a.    Its license of any Licensed Materials is for a limited period of time and grants use of the Licensed Materials on a non-exclusive basis for LRI's internal use and benefit only;

b.    The Licensed Materials are a valuable and highly confidential trade secret and intellectual property right owned by TGS;

c.    Except as provided in the New Geological Licenses, LRI will keep strictly confidential and take appropriate steps to ensure that its employees and agents keep strictly confidential the Licensed Materials, and not to "Show", allow the "Use" of, or "Deliver" the Licensed Materials to any other person; and

d.    Except as provided in the New Geological Licenses, LRI may not transfer the licenses or any of its rights and obligations thereunder, including without limitation, the license granted to LRI or the right of Use of the Licensed Materials.

32.    Moreover, the New Geological Licenses contain a provision that terminates the licenses in the event a direct or indirect change of ownership or control of LRI occurs without the prior written consent of TGS.

33.    Pursuant to the terms of Supplement No. 1 of the New Geological Licenses, Supplement No. 1 replaced all agreements which memorialized the terms and conditions by which LRI previously used TGS' LOG-LINE Plus!® data, including but not limited to any previous supplements under any other master license agreement between TGS and LRI that govern the terms of licensing LOG-LINE Plus!® data from TGS, and any previous LOG-LINE Plus!® Operating Agreement between TGS and LRI.

## V.  TGS' SPECIFIC OBJECTIONS TO THE DEBTORS' PLAN AND TO ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF ITS LICENSE AGREEMENTS WITH THE DEBTORS

A.    TGS' License Agreements are Executory Contracts

34.    TGS' License Agreements with LRI are executory contracts within the meaning of Bankruptcy Code § 365 as, among other things, LRI has continuing confidentiality obligations to the TGS Entities under those agreements and restrictions upon use of the Licensed Materials while, at the same time, TGS has continuing obligations to allow LRI to use the materials and/or to defend legal proceedings arising out of the licensing thereof. *See, e.g., In re Aerobox Composite Structures*, LLC, 373 B.R. 135 (Bankr. D.N.M. 7/27/07) (patent and technology license agreement found executory based primarily on continuing obligations of both parties to maintain confidentiality); *In re Chapin Revenue Cycle Management, LLC*, 343 B.R. 728 (Bankr. M.D.Fla. 3/1/06) (computer software licensing agreement held to be executory contract where the licensor had obligation to allow continued use by debtor and debtor had obligation to maintain confidentiality of software).  *See also In re Sunterra Corporation*, 361 F. 3d 257 (4th Cir. 3/18/04) (computer software licensing agreement held executory due to confidentiality obligations); *In re Superior Toy & Mfg. Co.*, 78 F. 3d 1169 (7th Cir. 3/7/96) (trademark license found to be executory contract).

B.    The Plan Provisions Purporting to Invalidate the Change of Ownership or Control Provisions Contained in the New Geological Licenses Between TGS and LRI are Contrary to Law. In addition or, alternatively, the Debtors Cannot Assume or Assume or Assign the New Geological Licenses Without Curing All Defaults Thereunder, Including Under the Change of Ownership or Control Provisions.

35.    In order to assume or assume and assign an executory contract, a debtor is generally required to (a) cure any existing default under the contract or provide "adequate assurance" of a

prompt cure; (b) compensate or provide adequate assurance that the debtor will compensate the other party to the contract for any actual pecuniary loss arising from the debtor's default thereunder; and (c) provide "adequate assurance of future performance" under the contract to the other party.   Bankruptcy Code § 365(b)(1). These requirements apply to defaults that occur under executory contracts either before or after commencement of the case.   *In re Luce Industries, Inc.*, 8 B.R. 100, 104 (Bankr. S.D.N.Y. 1980), *rev'd on other grds.*, 14 B.R. 529 (S.D.N.Y. 1981).

36.     Moreover, it is well-settled that an executory contract must generally be assumed in its entirety or not at all.   One cannot reject the burdens of an executory contract and accept only the benefits.   *In re E-Z Serve Convenience Stores, Inc.*, 289 B.R. 45, 49 (Bankr. M.D.N.C. 2003); *In re Rovine Corp.*, 6 B.R. 661, 666 (Bankr. W.D.Tenn. 1980).

37.     The New Geological Licenses entered into by LRI with TGS contain change of ownership or control provisions that automatically terminate the licenses in the event of a change of "Ownership" or "Control" of LRI, without the prior written consent of TGS.

38.     The New Geological Licenses unambiguously provide that unless LRI has obtained the prior written consent of TGS, the New Geological Licenses and the right of Use of the licensed Materials "**shall automatically terminate at the time an Acquisition occurs**",[28] and define the term "Acquisition" as meaning "the event of an Acquiror, directly or indirectly, acquiring (i) all or substantially all of the assets of Licensee or (ii) the **Ownership or Control of Licensee**, whether accomplished voluntarily or through operation of law, by statutory merger, consolidation or share

---

[28] Master License Agreement for Geological Data No. 3927 dated April 5, 2018, § 7.1, at p. 4.

13

exchange, by stock or asset sale or purchase, or by any other transaction method" (emphasis added).[29]

39.     Moreover, the New Geological Licenses define the terms "Ownership" and "Control" as follows:

a.     "Ownership" means the "direct or indirect rights in, or legal title to, greater than fifty percent (50%) of (i) outstanding common stock or other voting securities, (ii) equity interest, (iii) economic interest, (iv) voting power, (v) management or, (vi) interests in the profits".

b.     "Control" means "the ability to, directly or indirectly, direct, manage or dictate the actions of, or determine the management of, the entity in question by any method, including, without limitation, by the election of members of the board of directors or other governing body of such entity, by having the ability to exercise control over a majority number of members of such governing body or through the Ownership of, or the exercise of voting or consensual right with respect to, the common stock, voting securities or other interest held in such entity".[30]

40.     The Debtors' Plan envisions and clearly results in a change of Ownership and Control of LRI, as those terms are defined in the New Geological Licenses. Among other things, the Plan provides for current owners of the Common Stock and Preferred Stock of LRI's parent company, Lonestar US, to lose their equity interests and for the holders of the Prepetition Notes Claims to become the new owners of approximately ninety-six (96%) percent of Reorganized Lonestar US' New Equity Interests. While Reorganized Lonestar US may continue to own the equity of LRI, a change in Ownership will occur because, among other things, the new owners of Reorganized Lonestar will, after confirmation, have indirect ownership of LRI, and direct or

---

[29] *Id*. at ¶ 1.2. The term "Acquiror" is defined as "a person (or group of persons acting in concert), who acquires, directly or indirectly, (i) all or substantially all of the assets of Licensee or (ii) Ownership or Control of Licensee". *Id*. at ¶ 1.1.
[30] *Id*.at ¶¶ 1.4 & 1.15.

indirect voting power over and management of LRI.

41. Further, as of the Effective Date of the Plan, the terms of all current members of the Boards of Directors and officers of Lonestar US and each of its Debtor-subsidiaries (including LRI) are to expire, and the New Board of Reorganized Lonestar US and the boards of its subsidiaries are to be appointed. While the Debtors have not yet disclosed who will be on the New Board of Reorganized Lonestar US, other than its CEO, what is known is that the other directors will be selected by the "Ad Hoc Noteholders Group", rather than by the prior stockholders of Lonestar. Moreover, the Plan provides that the members of the New Board of Reorganized Lonestar US are to be the members of the new boards of directors or other governing bodies of each Debtor-subsidiary of Reorganized Lonestar US.

42. Change of ownership or control provisions of the type contained in the Master License have been held to be valid and enforceable against a debtor. *See, e.g.*, *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 174 (Bankr. E.D.Va. 1993).

43. Although 11 U.S.C. § 365(e) and (f) generally provide that *ipso facto* and anti-assignment clauses in executory contracts can be stricken as contrary to the Bankruptcy Code, it has been held that 11 U.S.C. § 365(e) and (f) do not operate to invalidate clauses that permit termination of a contract upon a change in control of the debtor party. *In re Washington Capital Aviation & Leasing*, 156 B.R. at 174 (noting that the change in control provision at issue was neither an *ipso facto* clause nor a non-assignment clause).

44. In any event, courts recognize that executory contracts should be evaluated on a case by case basis to determine the effect of enforcement of these types of provisions on both the debtor party and the non-debtor party, specifically including the extent of the economic detriment

suffered by the non-debtor party. *See In re E-Z Serve*, 289 B.R. at 50 (noting that a bankruptcy court's "authority to excise a bargained for element of a contract is questionable" and that "modification of a nondebtor contracting party's rights is not to be taken lightly").

45.     Here, the change in ownership or control restrictions in the New Geological Licenses are critical to TGS' business model as TGS makes a substantial investment in creating its own geophysical and geological data and interpretations thereof, and earns revenue by granting non-exclusive access to this data to multiple customers under restrictive license agreements.   If the change in ownership or control restrictions are not enforced, the value of those licenses will be severely diminished.   For this reason, the change in ownership or control provisions in the New Geological Licenses are essential, bargained-for elements of TGS' New Geological Licenses with LRI, which should be enforced.

46.     Accordingly, the provisions in the Debtors' Plan that purport to nullify change of ownership or control provisions such as are contained in TGS' New Geological Licenses are contrary to Bankruptcy law and non-Bankruptcy law.   Moreover, to the extent the Plan provides for a change of ownership or control of the Debtors in violation of the change of ownership or control provisions of TGS' New Geological Licenses and/or the Plan otherwise authorizes or enables the Debtors to assume or assume and assign TGS' New Geological Licenses without properly curing all defaults thereunder, including the Debtors' default under the change of ownership or control provisions contained therein, the Plan further violates settled Bankruptcy law.   For both of those reasons, confirmation of the Debtors' Plan should be denied.

47.     In any event, TGS objects to any assumption or assumption and assignment of the New Geological Licenses by the Debtors because, as is shown above, the Debtors' Plan is premised

upon a substantial change of Ownership and/or Control of LRI, as those terms are defined in the New Geological Licenses, and under settled bankruptcy law, the Debtors are prohibited from assuming or assuming and assigning the New Geological Licenses without curing all defaults thereunder, including non-monetary defaults such as under the change of ownership and control provision thereof.

48.     TGS further objects to assumption or assumption and assignment of the New Geological Licenses with the Debtors because the Debtors have failed to agree to cure all of their monetary defaults thereunder, including the following:

a.      Failure to pay TGS Invoice no. 336284 dated 8/31/20 in the sum of $120.00;

b.      Failure to pay TGS Invoice no. 336384 dated 9/16/20 in the sum of $11,250.00; and

c.      Failure to pay TGS Invoice no. 333330 dated 4/30/20 in the sum of $30.00.

C.     In addition or, Alternatively, TGS' License Agreements are non-assumable and non-assignable under Bankruptcy Code § 365 (c)(1)(A).

49.     Although Bankruptcy Code § 365(a) gives a debtor or trustee, with court approval, the right to assume (or reject) executory contracts, and Bankruptcy Code § 365(f) generally gives the debtor or trustee the power to assign executory contracts, Bankruptcy Code § 365(c)(1)(A) contains an exception to both of those grants of authority.  Bankruptcy Code § 365(c)(1)(A) provides that a trustee may <u>not</u> assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if:

(a) "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an

17

entity other than the debtor or the debtor in possession . . .," and (b) "such party does not consent to such assumption or assignment . . .".

i.  *Trade Secret Law is "Applicable Law" Preventing Assumption or Assumption and Assignment as Proposed by the Debtors in their Plan under § 365(c)(1)(A)*

50.  It has been held that the phrase "applicable law" as used in Bankruptcy Code § 365(c)(1)(A) means "any law applicable to a contract, other than bankruptcy law".  *See In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011).  TGS asserts that Texas and U.S. trade secrets laws constitute "applicable law" under Bankruptcy Code § 365(c)(1)(A) and excuse TGS from accepting performance from or rendering performance to an entity other than LRI, thus precluding assumption and assignment of TGS' License Agreements without TGS' consent.[31]

51.  The Texas Supreme Court has defined a trade secret as "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). It is axiomatic that the secrecy of a trade secret is of paramount importance for the information to maintain its value: trade secrets must necessarily remain secret to be useful to the owner. *See generally Rugen v. Interactive Bus. Sys., Inc*., 864 S.W.2d 548, 552 (Tex.App.-Dallas 1993, no writ) ("[A] trade secret can exist in a combination of characteristics and components[,] each of which, by itself, is in the public domain, but the unified process, [the] design and operation of which in unique combination[ ] affords a competitive advantage, is a protected trade secret.")

52.  It has been uniformly held that seismic data is a protected trade secret under Texas law.  *See, e.g., In re Bass*, 113 S.W.3d 735, 742 (Tex. 2003).  *See also Musser David Land Co.*

---

[31] The Master License stipulates that Texas law is to be the law governing the agreement.

*v. Union Pac. Res.*, 201 F.3d 561, 569 (5th Cir. 2000). In determining that seismic data is considered a trade secret, the Texas Supreme Court has recognized that seismic data and other methods for obtaining subsurface geological information are widely considered trade secrets both within the oil and gas industry and at law. *See In re Bass*, 113 S.W.3d at 742. Further, the United States Bankruptcy Court for the Western District of Texas has also found subsurface data, including both seismic and microseismic data and well logs, to be entitled to trade secret protection under Texas law. *In re TXCO Res., Inc.*, 475 B.R. 781 (Bankr. W.D. Tex. 2012). This Court should follow the Texas Supreme Court, the Fifth Circuit and the Western District of Texas by finding that the Licensed Materials, including the geological, well, petroleum and other data and derivatives licensed to LRI by TGS, are likewise trade secrets.

53. Indeed, in the New Geological Licenses between TGS and LRI, LRI acknowledged and agreed that the Materials licensed to it thereunder constitute valuable, proprietary and highly confidential trade secrets and intellectual property of TGS.[32]

54. Under the Texas version of the Uniform Trade Secrets Act, an actionable misappropriation is considered to exist and may be enjoined when a disclosure or use of a trade secret occurs without the express or implied consent of the owner.[33] Tex. Civ. Prac. & Rem. Code § 134A.002(3). Further, a person who, without the owner's consent, knowingly communicates or transmits a trade secret, is guilty of committing a felony. *See* Tex. Penal Code § 31.05.

---

[32] Master License Agreement for Geological Data No. 3927 dated April 5, 2018, § 4.1, at p. 3.
[33] A trade secret is defined as information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Uniform Trade Secrets Act, § 1(4).

55.     Similarly, the Defend Trade Secrets Act of 2016 creates a federal cause of action for trade secret misappropriation that in large part mirrors the Uniform Trade Secrets Act.   The definition of the term "trade secret" in the Defend Trade Secrets Act ("DTSA") is similar to the definition found in the Uniform Trade Secrets Act, and the remedies set forth in the DTSA are in large part, similar to the state version.[34]  *See* 18 U.S.C. § 1836 *et seq*.   Further, while the DTSA creates federal jurisdiction over trade secret theft, it does not preempt state trade secret law and allows trade secret owners to pursue federal civil remedies as an alternative to or in addition to existing state remedies. 18 U.S.C. § 1838.

56.     Although there is no case law specifically discussing whether trade secret law is "applicable law" under § 365(c)(1)(A), the trade secrets laws serve similar purposes to other laws considered "applicable law" under § 365(c)(1)(A), such as federal trademark, patent and copyright law, which prohibit nonconsensual assignments in order to provide protection to owners of information or materials that derive their value from being difficult to develop, unique and/or not publicly available by limiting who can use the information or materials without the owner's consent.[35]  Moreover, under both the Texas Uniform Trade Secrets Act and the Defend Trade

---

[34] On the other hand, the DTSA provides an ex parte seizure procedure for use where the party against whom the seizure is ordered "would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person…." 18 U.S.C. § 1836(b)(2).

[35] *See e.g. In re Trump Entm't Resorts, Inc*., 526 B.R. 116, 124 (Bankr. D. Del. 2015)("federal trademark law generally bans assignment of trademark licenses absent the licensor's consent because, in order to ensure that all products bearing its trademark are of uniform quality, the identity of the licensee is crucially important to the licensor"); *In re CFLC, Inc.*, 89 F.3d 673, 679 (9th Cir. 1996)(The fundamental policy of the patent system is to "encourag[e] the creation and disclosure of new, useful, and non-obvious advances in technology and design" by granting the inventor the reward of "the exclusive right to practice the invention for a period of years"… free assignability—of nonexclusive patent licenses would undermine the reward that encourages invention because a party seeking to use the patented invention could either seek a license from the patent holder or seek an assignment of an existing patent license from a licensee. In essence, every licensee would become a potential competitor with the licensor-patent holder in the market for licenses under the patents."); *In re Patient Educ. Media, Inc*., 210 B.R. 237, 242 (Bankr. S.D.N.Y. 1997)("The federal policy designed to protect the limited monopoly of copyright owners and restrict unauthorized use constitutes applicable nonbankruptcy law. It prevents the trustee from assigning the nonexclusive license absent the owner's

Secrets Act of 2016, any transfer or use of a trade secret requires the express or implied consent of the owner thereof.   Thus, the Texas Uniform Trade Secrets Act and the Defend Trade Secrets Act of 2016 should be found to constitute "applicable law" under Bankruptcy Code § 365(c)(1)(A) that excuses TGS from accepting performance from or rendering performance under its License Agreements to entities other than LRI.

ii.    *Copyright Law is also "Applicable Law" Preventing Assumption or Assumption and Assignment under § 365(c)(1)(A)*

57.    The U.S. Copyright Act further constitutes "applicable law" under Bankruptcy Code § 365(c)(1)(A) and excuses TGS from accepting performance from or rendering performance to an entity other than LRI, thus precluding assumption and assignment of the License Agreements under Bankruptcy Code § 365(c)(1)(A), notwithstanding the terms of the Debtors' Plan.

58.    The Copyright Act, 17 U.S.C. §102, *et. seq.*, provides protection to the authors of "original works of authorship" fixed in "any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated," including but not limited to both published and non-published literary, pictorial, graphic, artistic, audiovisual, sound recording, architectural, and certain other intellectual works. It also applies to and protects compilations and derivative works.

59.    Although materials may be registered in the Copyright Office, registration is not required in order to obtain the protections of the Copyright Act, which arise when the work is "created." *See* 17 U.S.C. §§ 302, 408.

---

consent.")

60.     For a work to be sufficiently original for copyrightability, it needs only have been independently created (as opposed to copied from other works) and possess "at least some minimal degree of creativity." *Mason v. Montgomery Data, Inc.,* 967 F.2d 135, 141 (5th Cir. 1992). In other words, the work must have a "creative spark." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345, 111 S.Ct. 1282, 1290 (1991). But not much more than a spark. The Supreme Court has held that the level of creativity required under the Copyright Act "is extremely low; even a slight amount will suffice." *Feist*, 111 S.Ct. at 1287. Indeed, copyright protects works that possess just something "more than a de minimis quantum of creativity." *Id.* at 1297. In fact, "a work may be protected by copyright even though it is based on . . . something already in the public domain if the author, through his skill and effort, has contributed a distinguishable variation from the older works." *Donald v. Zack Meyer's T.V. Sales & Serv.*, 426 F.2d 1027, 1029 (5th Cir.1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 459 (1971).

61.     For example, photographs have long been held to be copyrightable, notwithstanding the objections of 19th century artists who argued that photographs were merely mechanical reproductions of the physical features or outlines of an object. *See SHL Imaging, Inc. v. Artisan House, Inc.,* 117 F. Supp. 2d 301, 308-311 (S.D.N.Y. 2000). Courts now widely recognize that, in taking a photograph, the photographer makes a series of creative choices intended to evoke the desired expression before any image is captured, such as the posing of the subject, the lighting, the angle and perspective of the shot, and the selection of the type of film and camera. *See Biggs v. Cabela's, Inc.,* No. 4:03-CV-0205-A, 2004 WL 530167, * 4 (N.D. Tex. Feb. 23, 2004); *SHL Imaging, Inc.,* 117 F. Supp. 2d at 308-311.

62.     Similarly, maps have been held to be copyrightable, even though a map at its core is designed to accurately reflect the location, size and other relevant information of land parcels. The author of a map utilizes his originality and creativity in the designing the map, including choices regarding the placement, size and dimensions of individual tracts of land, geographic conditions and other features and in coordinating, arranging or even drawing the geographic information differently than as might be seen in other maps. *See Mason,* 967 F.2d at 139-141; *City of New York v. Geodata Plus, LLC*, 537 F. Supp. 2d 443, 450-52 (E.D.N.Y. 2007); *Newton v. Voris*, 364 F. Supp. 562, 563-64 (D. Or. 1973) ("The fact that the source of the material for the map is in the public domain does not void the copyright, but [the material] is subject to the requirement of originality and creativity.") (internal citations omitted).

63.     The value-added well data products licensed to LRI under TGS' License Agreements, much like photographs and maps, are "original works of authorship" of the TGS Entities fixed in a tangible medium of expression from which they can be perceived, reproduced or otherwise communicated.  Moreover, the well data products are formed by calibrating, merging, processing, collecting and assembling the data using TGS' judgment in such a way as to create a unique product.

64.     It has been held that under U.S. copyright law, nonexclusive licenses such as was granted to LRI by TGS under the License Agreements are personal to the licensee, and the licensee cannot assign them to a third party without the consent of the copyright owner.  *See, e.g., In re Patient Education Media, Inc*., 210 B.R. 237, 241 (Bankr. S.D.N.Y. 1997); *In re Buildnet, Inc*., 01-82293, 2002 WL 31103235, at *5 (Bankr. M.D.N.C. Sept. 20, 2002).  This is primarily because, under 17 U.S.C. §204(a), a transfer of copyright ownership, other than by operation of

23

law (such as succession law), is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed.   For that reason, it has been held that U.S. copyright law constitutes "applicable law" under Bankruptcy Code § 365 (c)(1)(A) that "excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession . . .".   *See, e.g., In re Sunterra Corporation*, 361 F.3d 257, 262 (4th Cir. 2004); *In re Golden Books Family Entertainment, Inc.*, 269 B.R. 300, 309-310 (Bankr. D.Del. 2001); *In re Patient Education Media, Inc.*, 210 B.R. 237, 243 (Bankr. S.D.N.Y. 1997).

65.     Because TGS' License Agreements are protected under trade secret and copyright laws, Bankruptcy Code § 365 (c)(1)(A) prohibits their assumption or assumption and assignment by the Debtors without TGS' consent.   As such, the provision of the Plan purporting to authorize the Debtors to assume or assume and assign TGS' License Agreements without the consent of TGS violates Bankruptcy law.   In any event, TGS does not consent to assumption or assumption and assignment of its License Agreements, absent payment of a mutually agreed upon cure amount.

D.     <u>The Release Provisions in the Debtors' Plan are Overbroad and Contrary to Law</u>.

66.     Finally, the Debtors' Plan contains a broad release provision that releases the Debtors, the Reorganized Debtors and numerous third parties from a broad array of both pre and post-Petition claims, obligations, actions, and omissions.

67.     Among other things, the release provision in the Plan releases the Debtor, its estate, and the Reorganized Debtors, from:

"any and all Claims, Causes of Action, . . . and liabilities whatsoever, . . . existing as of the Effective Date or thereafter arising, . . . **based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date** arising from or related in any way in whole or in part to any of the Debtors or their Affiliates . . . that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties . . .". (emphasis added).[36]

68.     The Fifth Circuit takes a "very restrictive" approach to releases in bankruptcy cases. To that end, it has recognized that § 524(e) of the Bankruptcy Code generally prohibits non-consensual, non-debtor releases, and the Court has indicated that a plan containing such a release is non-confirmable. *See In re Vitro S.A. B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012), *cert. dismissed*, 569 U.S. 944 (2013), *citing In re Pac. Lumber Co.*, 584 F3d 229, 252 (5th Cir. 2009). Moreover, it has been held that a release provision will be found to be prohibited, thus rendering the plan non-confirmable, if the language of the release is vague, over broad or does not specifically set out who is affected by the release and the specific claims that are being released. *See, e.g., Hernandez v. Larry Miller Roofing, Incorporated*, 628 Fed. Appx. 281, 286-288 (5th Cir. 1/6/16); *In re Patriot Place, Ltd.*, 486 B.R. 773, 821-821 (Bankr. W.D.Tex. 2013).

69.     The release provision contained in the Plan is vague, non-specific, and over broad in violation of Fifth Circuit requirements.   Nowhere does the release identify any specific claims intended to be released, or the identity of the specific parties who are to be releasing those claims. Yet, to be effective, the Fifth Circuit has made it clear that a release must be specific in what it

---

[36] *Id*. at p. 57 of 165.

releases and may not contain generic boilerplate language as does the release proposed in the Debtors' Plan. *Hernandez*, 628 Fed. Appx. at 287-288.

70.     Moreover, the release provision is so over broad that it could be construed as barring TGS and other similarly situated licensors of geophysical material, geological materials, intellectual property, trade secrets, and copyrighted or patented materials, whose licenses are non-assumable and non-assignable under Bankruptcy Code § 365 (c)(1)(A) from being able to assert rights, benefits and remedies contained in their licenses or under applicable law against the Reorganized Debtors, such as their rights to terminate the licenses as a result of a pre-petition default or a default occurring during the bankruptcy proceeding as well as to require the return or destruction of the licensed data, as required by the license. That would run contrary to the very purpose and intent of Bankruptcy Code § 365 (c)(1)(A).

## VI.     RESERVATION OF RIGHTS

71.     TGS reserves the right to raise other objections it may have to confirmation of the Debtors' proposed Plan and/or assumption or assumption and assignment of its License Agreements, as well as all other rights including, without limitation, the right to file any such further and additional objections to any filings in this proceeding that it deems appropriate.

## VII.     CONCLUSION

For the foregoing reasons, TGS prays that the Court deny confirmation of the Debtors' Plan, as written, reject the Debtors' proposed assumption or assumption and assignment of TGS' License Agreements without TGS' consent and without curing all defaults thereunder, including both the monetary defaults and non-monetary defaults such as under the change of ownership and control provisions thereof, and provide any other and further relief as is just and equitable.

Respectfully submitted,

/s/ Andrew A. Braun
ANDREW A. BRAUN
Texas State Bar No. 24061558
GIEGER, LABORDE & LAPEROUSE, L.L.C.
Suite 4800, 701 Poydras Street
New Orleans, Louisiana   70139-4800
Telephone:   (504) 561-0400
Facsimile: (504) 561-0100
Email: abraun@glllaw.com

*Counsel for A2D Technologies, Inc., d/b/a*
*TGS Geological Products and Services*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing pleading was served

via electronic mail on the 27th day of October, 2020, upon all parties in interest listed on the ECF

service list.

/s/ Andrew A. Braun
ANDREW A. BRAUN

27